IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 21-cv-_

BRIAN WILLIAMS,

    Plaintiff,

vs.

CITY OF ARVADA and DAN PUMPHREY,

    Defendants.

## COMPLAINT AND JURY DEMAND

Plaintiff Brian Williams, by his attorney Robert M. Liechty of ROBERT M LIECHTY PC, and Refugio Perez of HAMILTON FAATZ PC, brings his complaint as follows:

1. Plaintiff Brian Williams lives in the City of Arvada. He used to work for defendant City of Arvada. At the time of his termination, his superintendent was defendant Dan Pumphrey.

2. Mr. Williams brings claims of age and disability discrimination under the ADEA, 29 USC §621 *et seq.*, and under the ADA, 42 USC §12101, *et seq.*, as well as claims under the corresponding sections of Colorado's anti-discrimination act, CRS §24-34-401 *et seq.* This court has federal subject matter jurisdiction.

3. Mr. Williams timely filed a complaint of age and disability discrimination with Colorado's Civil Rights Division against defendants and received a right to sue letter on

May 27, 2021.  Mr. Williams has exhausted his administrative remedies and has timely filed his complaint in this court.

    4.  Mr. Williams worked since 1988 in the City's streets department, principally on the concrete and asphalt crews.  He was 56 years old at the time of his constructive termination.

    5.  Mr. Williams worked on the concrete crew for 17 of his 32 years with the City.  When fully staffed, the concrete crew had one supervisor, two foremen, and seven workers.  Mr. Williams was a foreman for 17 years.  No one with the City was as adept as he on the backhoe or in fabricating metal for the jobs.

    6.  In 2016, Mr. Williams injured his left shoulder at work which was repaired with an operation on January 31, 2017.  He was out of work for three weeks and returned to light-duty work as a traffic-engineering inspector for approximately 11 months.

    7.  His then-immediate supervisor in the streets department informed him that if he could not within two days return without restrictions to his job as foreman, he would be terminated.  Mr. Williams quickly obtained a doctor's release (although it was premature) to protect his job.

    8.  Notwithstanding this red flag regarding the City's impatience with his recovery, Mr. Williams first noticed discrimination against him in 2017.  There was a supervisory position open and Mr. Williams and co-employee Larry Stewart (both over 40 years old at the time) applied for this position.  Mr. Williams believes they were the only applicants over 40 years old.

9. The then-superintendent, Mark Bowman, sabotaged their applications when he told them not to submit their resumes, which, to them, seemed a reasonable directive since they were both so well known in the department, with 30 and 40 years seniority respectively, and their resumes were not necessary. However, simply because they did not submit their resumes, they were rated as the eighth and ninth applicants out of a total of nine applicants, and received no consideration. The job went to an applicant under age 40.

10. On February 6, 2019, Mr. Pumphrey and supervisor Keith Bohan asked Mr. Williams how much longer he planned to work before retiring. On March 13, 2019, Mr. Pumphrey asked plaintiff if he needed to get someone younger to do a job plaintiff was working on.

11. On May 7, 2019, Mr. Pumphrey asked plaintiff how old he was and again asked when he planned on retiring.

12. On June 6, 2019, Mr. Williams aggravated an old injury to his right shoulder (the other shoulder than the one he repaired in 2017) at work on the concrete crew. He re-aggravated the injury the following day and was sent home.

13. On June 8, 2019, Superintendent Dan Pumphrey and Mr. William's immediate supervisor, Craig Koehler, were caught searching Mr. William's private locker at work, trying to find evidence of some wrongful conduct upon which they could force his departure. They found nothing, but this fits a pattern of how the streets department manufactures reasons to force out unfavored employees.

14. On June 9, Mr. Williams confronted both Mr. Pumphrey and Mr. Koehler about the search of his locker.  Plaintiff had seen supervisors do this before and he asked them why they were trying to build a case against him after his 31 years of service.  He also asked them why they didn't tell him first before searching his locker, as the City's policies require.  Their answers were evasive.

15. On June 15, 2019, the City required plaintiff to bring in medical documentation for his doctor and physical therapy visits.  This had never been requested of him before.

16. On August 9, 2019, Mr. Pumphrey asked plaintiff, during his lunch, how he was holding up.  He said that this work is hard on the body and referred to plaintiff's use of worker's compensation.  He said that plaintiff appeared to be "falling apart."

17. In late August, 2019, the person who walked in on the search of plaintiff's locker, Tom Swartwood (also over 40 years old), was put on administrative leave.  He was a passenger in a city vehicle involved in a hit-and-run accident.  Because the car that hit his car drove away, Mr. Swartwood's driver decided to move the city vehicle out of the line of traffic, to which Mr. Swartwood said "go ahead."  Mr. Swartwood was put on leave while the driver was not.  This was clearly an excuse to force him to quit which, in fact, he did.  It is also an example of how the department forces disfavored employees to quit.

18. On September 3, 2019, Mr. Williams had an operation on his right shoulder, the shoulder he aggravated three months before, to repair his rotator cuff.  He was off work for approximately three weeks and then returned to light-duty on the sweeping and mowing crew from late September, 2019, through early June, 2020.

19. On November 1, 2019, Mr. Pumphrey asked plaintiff how he was doing and whether he would recover fully.  Mr. Pumphrey complained that the workers compensation doctor was stretching out plaintiff's recovery and that the City needed its employees to come back to work.

20. On January 27, 2020, Mr. Koehler gave plaintiff his annual evaluation for 2019. He asked Mr. Williams if he was training his replacements.

21. In the evaluation, Mr. Koehler wrote that "Brian [Williams] was asked to be the sole Foreman on the concrete crew.  He had partnered with Larry Stewart in the past but changes in the Division led to Brian being on his own.  He was not accustomed to being the lead man on concrete jobs [plaintiff actually had been doing this for years] and it was a bit of a transition for him.  He was able to make the necessary adjustments and take control of the crew."  Mr. Koehler also noted that plaintiff had pushed through the challenges and said that "I know that these things have made Brian a better employee in the long run …"  In other words, according to Mr. Koehler, plaintiff was performing well as a foreman.

22. On March 24, 2020, plaintiff's doctor rated plaintiff's right shoulder at maximum medical improvement.  Although the doctor said that his shoulder would never fully return to its prior condition (he had a 5% workers' compensation disability), plaintiff completed tests with the City to show that he could perform all his job functions.

23. On May 11, 2020, Mr. Pumphrey asked plaintiff how much longer he planned on working for the City.

24. On Monday, June 8, 2020, plaintiff returned to the concrete crew to trade with Tyler Wheeler, who was cross training for approximately one month with the sweeping and mowing crew.

25. On Thursday, July 16, 2020, the regular 7:00 crew meeting led by supervisor Koehler lasted until approximately 7:15.  Mr. Koehler told the crew that Mr. Williams was going back to the sweeping and mowing crew.  Mr. Williams objected to this move in front of the other workers.

26. Mr. Williams knew that he had been cleared to return to his regular job duties as a foreman on the concrete crew.  Plus, he knew that he was needed on the concrete crew because the crew's production had been low since his absence and his crew members wanted him to stay.  He was the best person to operate the backhoe and to fabricate items necessary for the crew.  Therefore, he asked Mr. Koehler why he was being transferred back to a position with the sweeping and mowing crew where he was not needed.  Mr. Koehler said that this was not his decision, but they could talk to Superintendent Pumphrey about it.

27. Mr. Koehler escorted plaintiff into the building to meet with Mr. Pumphrey, although Mr. Koehler knew that Mr. Pumphrey was at City Hall at the time.  Because Mr. Koehler knew that Mr. Pumphrey was not in his office, he passed by Mr. Pumphrey's office and went down the hall to his office where Mr. Koehler began yelling at Mr. Williams: "Take a seat."  "Did you really think you are going to be full time to replace Andy [who had replaced Mr. Williams on the concrete crew]?"  "You're not going to do

6

this in front of the crew." "You know all the answers, so why are we talking." "The decision isn't up to me – it's up to Dan [Pumphrey]."

28. Mr. Williams knew that he could not lose his temper with Mr. Koehler because he had seen City supervisors use that technique (goading an employee to lose his or her temper) as an excuse to fire the employee for "violence in the workplace." Mr. Williams told Mr. Koehler that he would not stay in a room where Mr. Koehler was yelling at him and he left at approximately 7:20 to go to his office.

29. Mr. Williams then called Mr. Pumphrey and left a message that he needed to have a meeting with Mr. Pumphrey and Mr. Koehler. He next called Craig Smith, the supervisor of sweeping and mowing, to tell him that he would see him on Monday morning. Mr. Williams had previously scheduled a vacation day for that Friday.

30. Mr. Koehler saw Mr. Williams in the hallway and said, "I've got you now." Mr. Williams went home for the day. Mr. Pumphrey called that afternoon to tell him that he was on administrative leave, but he refused to give a reason for the leave even though plaintiff asked for a reason. This was against City policy which requires that the supervisors talk to the employee before putting the employee on administrative leave.

31. Mr. Williams was accused of "violence in the workplace" and "conduct unbecoming a foreman," both premised on Mr. Williams supposedly intimidating Mr. Koehler by leaving the meeting in Mr. Koehler's office where Mr. Koehler was yelling at him. Such an accusation, besides having no factual support, was against the practices of the City because Mr. Williams should have received no more than a reprimand and a

chance to discuss the issue with Mr. Pumphrey and Mr. Koehler.  Instead, the incident was elevated to a human-resources hearing, with the goal of termination.

32. Mr. Pumphrey wrote a recommendation for termination dated July 21, 2020.  In it, he referred to an incident that happened in 2000.  This was clearly not a reason for termination 20 years later in 2020.  He also solicited after the fact four incidents purportedly to justify termination.

33. The first of the four alleged incidents happened in September, 2014 (six years before termination), which involved co-foreman Tom Buchholz.  Mr. Buchholz and Mr. Williams were sent to finish a "rodeo" course in which City employees would compete on various vehicles to qualify for a state competition.  Upon arriving, Mr. Buchholz immediately went onto the finished part of the course to practice.  Mr. Williams worked by himself for about three hours after which the two of them had a heated verbal exchange about why Mr. Buchholz was not working.  Both received written reprimands for unbecoming public conduct.

34. Mr. Pumphrey also included a 2016 incident between plaintiff and his then supervisor, Terry LoSasso.  This incident concerned Mr. Williams and Mr. LoSasso talking about two problem crew members.  Mr. Williams was talking loudly simply because he disapproved of the problem crew members.  Mr. LoSasso agreed with Mr. Williams on this point.  Craig Smith, a supervisor of the asphalt crews, heard the loud discussion, so Mr. Williams closed Mr. LoSasso's office door when Mr. Smith appeared to be bothered by the noise.  This was no incident at all.  Mr. LoSasso said nothing of it at the time.

35. In November, 2018, plaintiff allegedly was upset when Keith Bohan was promoted over Mr. Williams.  Approximately three weeks later, Mr. Williams went into the office of Mr. Pumphrey to give him a heads up that members of his crew were grumbling about Mr. Bohan's promotion.  Again, this was not an incident at all when it occurred.

36. In the spring of 2019, plaintiff allegedly had a confrontation with supervisor Bohan.  Mr. Bohan had called Mr. Williams in the field to find out where he was.  When Mr. Williams returned to his office, he told Mr. Bohan that Mr. Bohan did not need to worry as to whether Mr. Williams was ensuring that his crew was at work.  As with the above, this was not an incident at all.

37. Mr. Pumphrey solicited these four incidents, after the fact, in an effort to justify Mr. William's termination.

38. These incidents were used as an excuse to cover the real reason for Mr. Pumphrey recommending termination – Mr. Williams was getting older, physically wearing out, and becoming a liability for the City.

39. Five days after the incident with Mr. Koehler, Mr. Williams had his first administrative hearing before HR on July 21, 2020.  He then had a second administrative hearing before HR and the Director of Public Works on August 12.  At those hearings, the City disregarded the testimony from two witnesses who said that they were 25 feet away from Mr. Koehler's office and heard Mr. Koehler yelling at Mr. Williams.  The witnesses also said that they never heard Mr. Williams raise his voice in the meeting where he supposedly committed "violence."

40. However, the City credited testimony from two witnesses, friendly to the City, who were not even in the building at the time of the yelling.

41. One witness said that Mr. Williams treated Mr. Koehler disrespectfully in the crew meeting (prior to the yelling episode) when Mr. Williams asked why he was being sent back to the sweeping and mowing crew.

42. The second witness, who was hired to replace Mr. Williams on the concrete crew, merely said that Mr. Williams was a "stand back" foreman, hardly any support for an accusation of "violence in the workplace." In short, the hearings were perfunctory and had nothing to do with whether Mr. Williams committed "violence in the workplace."

43. Mr. Williams was scheduled for a meeting with the Dir. of Public Works on September 9, 2020. Prior to that meeting, Jeff Monzingo, senior business partner in HR, told Mr. Williams that the Director was going to fire him in that meeting unless Mr. Williams chose to retire before the meeting. Mr. Williams had no choice but to retire. Thus, he was constructively discharged.

44. Shawn Ivazes, who was younger than 40 years old, filled plaintiff's position as foreman on the concrete crew.

### *Age Discrimination (City)*

45. Mr. Williams was 56 years old at the time of his constructive termination and was in the protected age group. He was doing satisfactory work when he was discharged. His position was filled by a person under the age of 40 years old.

46. He was constructively terminated because of his age which violates the ADEA, 29 USC §621 *et seq*. This also violates CRS §24-34-402(1)(a).

10

47. These violations entitle plaintiff to his lost wages under 29 USC §626 and §24-34-405(g).

48. Defendant City knew or recklessly disregarded the fact that its conduct violated the ADEA when it forced Mr. William's resignation.  Therefore, the City is liable for liquidated damages under §626(b) and §24-34-405(3)(g).

49. The City is also liable for attorney's fees under 29 USC §216 and §24-34-405(5).

### *ADA Violation for Perceived Disability (City)*

50. In spite of the fact that Mr. Williams had been cleared to return to his former job with the concrete crew, the City would not let him return to his former position because it perceived that he was disabled under the ADA.  In fact, Mr. Williams was qualified even without accommodations to perform the essential functions of his former position on the concrete crew.  He was forced to resign because of his perceived disability.

51. Under the ADA, 42 USC §12112 and §24-34-402(1)(a), it is unlawful to discriminate against an employee's perceived disability.  The City believed that Mr. William's injuries were showing that he was wearing out, getting worse, and that he would be a long-term liability for the City because of his permanent injuries.

52. Mr. Williams is entitled to back pay and front pay, compensatory damages, and reasonable attorney's fees and costs under §12117(a).  He is entitled to the same recovery under §24-34-405.

### *Age Discrimination Plus (City)*

53. In the alternative, the City is liable for age discrimination plus perceived-disability discrimination. The ADEA prohibits such discrimination even if the perceived-disability discrimination is not itself protected.

54. Defendant City knew or recklessly disregarded the fact that its conduct violated the ADEA when it forced Mr. Williams to resign.

55. Mr. Williams is entitled to the same damages and recovery as set forth in ¶¶ 47-49 above.

### *Aiding and Abetting Age Discrimination (Pumphrey)*

56. Defendant Pumphrey aided and abetted the City in forcing Mr. Williams to resign, which violates §24-34-402(1)(e)(I).

57. Pursuant to §24-34-405, he is liable to plaintiff for the same damages and recovery for which the City is liable in ¶¶ 47-49 above.

### *Intentional Interference with Contract (Pumphrey)*

58. Mr. Williams had an employment contract with the City of Arvada. Mr. Pumphrey knew of this employment contract. Mr. Pumphrey by words or conduct intentionally caused the City to terminate this employment contract.

59. Mr. Pumphrey caused the termination of plaintiff's contract out of personal bias and not as part of his official duties. Because he was acting out of personal bias, he was acting outside of his official duties when he caused Mr. William's termination.

60. Mr. Pumphrey's interference with plaintiff's contract was improper. His interference with the contract damaged Mr. Williams by loss of income, humiliation,

12

inconvenience, and damage to his reputation.

61. The actions of defendant Pumphrey were willful and wanton.

WHEREFORE, plaintiff Brian Williams respectfully requests that this court enter judgment in his favor and for interest, costs, attorney's fees, and such other relief as this court may deem proper.

Plaintiff demands trial to a jury.

Respectfully submitted this August 17, 2021.

By: s/    *Robert M. Liechty*
Robert M. Liechty
ROBERT M LIECHTY PC
1800 Gaylord St.
Denver, Colorado 80206
Tel: (303) 861-5300
Fax: (303) 861-2746
Email:  rliechty@crossliechty.com

By: s/    *Refugio Perez*
Refugio Perez
HAMILTON FAATZ PC
5105 DTC Parkway, Suite 475
Greenwood Village, Colorado 80111
Tel: (303) 830-0500
Fax: (303) 860-7855
Email:  rperez@hamiltonfaatz.com
ATTORNEY FOR PLAINTIFF

Address of plaintiff:
5520 Reed Ct.
Arvada, CO 80002

Courtesy copy emailed to City Attorney Rachel Morris