**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-cv-02236-NYW

BRIAN WILLIAMS,

      Plaintiff,

v.

CITY OF ARVADA, and
DAN PUMPHREY,

      Defendants.

---

## ORDER

---

Magistrate Judge Nina Y. Wang

      This action comes before the court on Defendant City of Arvada and Dan Pumphrey's ("Defendants") Motion to Dismiss Age Discrimination, Age Discrimination Plus, Aiding and Abetting Age Discrimination, and Intentional Interference of Contract Claims ("Motion to Dismiss" or "Motion") [Doc. 13, filed October 15, 2021]. The court considers the Motion pursuant to 28 U.S.C. § 636(c) and the Order of Reference dated October 6, 2021 [Doc. 11]. *See also* [Doc. 7]. The court finds that oral argument would not materially assist in the resolution of the issues in the Motion. For the reasons explained herein, the court respectfully **GRANTS IN PART AND DENIES IN PART** the Motion to Dismiss.

## BACKGROUND

### I.    Factual Allegations

      This action arises from the termination of Plaintiff Brian Williams's ("Mr. Williams" or "Plaintiff") employment from the City of Arvada ("City"). The following facts are drawn from the Complaint and Jury Demand ("Complaint"), [Doc. 1, filed August 17, 2021], and taken as true for the purposes of the instant Motion.

Mr. Williams began his employment with the City's "street department" in 1988, working "principally on the concrete and asphalt crews." [Doc. 1 at ¶ 4]. Specifically, Mr. Williams spent seventeen years of his 32-year tenure with the City working on the concrete crew. [*Id.* at ¶ 5]. In 2016, Mr. Williams injured his left shoulder at work. [*Id.* at ¶ 6]. His shoulder injury was "repaired with an operation" in January 2017, after which Mr. Williams then was absent from work for three weeks, and then he "returned to light-duty work as a traffic-engineering inspector for approximately 11 months." [*Id.*]. Mr. Williams alleges that "[h]is then-immediate supervisor in the streets department informed him that if he could not within two days return without restrictions to his job as foreman, he would be terminated." [*Id.* at ¶ 7]. In response, "Mr. Williams quickly obtained a doctor's release (although it was premature) to protect his job." [*Id.*].

Mr. Williams alleges that he first noticed discrimination based on his age in 2017, when he and a coworker, both of whom were over 40 years old at the time, applied for an open supervisory position. [*Id.* at ¶ 8]. Mr. Williams claims that "[t]he then-superintendent, Mark Bowman, sabotaged their applications" by advising them "not to submit their resumes, which, to them, seemed a reasonable directive" given their respective decades-long tenures with the City. [*Id.*]. However, "because they did not submit their resumes, they were rated as the eighth and ninth applicants out of a total of nine applicants" and were not considered for the job, which ultimately went to an applicant who was younger than Mr. Williams and his coworker. [*Id.* at ¶ 9].

On February 6, 2019, Defendant Dan Pumphrey ("Mr. Pumphrey" or "Defendant Pumphrey") and another supervisor, Keith Bohan, "asked Mr. Williams how much longer he planned to work before retiring." [*Id.* at ¶ 10]. On March 13, 2019, Mr. Pumphrey asked Mr.

Williams "if he needed to get someone younger to do a job [P]laintiff was working on" and, on May 7, 2019, Mr. Pumphrey asked Mr. Williams "how old he was and . . . when he planned on retiring." [*Id.* at ¶¶ 10–11]. Mr. Williams alleges that, on June 8, 2019, Defendant Pumphrey and Plaintiff's immediate supervisor, Craig Koehler ("Mr. Koehler" or "Supervisor Koehler"), "were caught searching [Plaintiff's] private locker at work" in an effort to "find evidence of some wrongful conduct upon which they could force [Plaintiff's] departure." [*Id.* at ¶ 13]; *see also* [*id.* at ¶ 14].

On August 9, 2019, Mr. Pumphrey asked Plaintiff "how he was holding up[,]" stated "that this work is hard on the body and referred to [P]laintiff's use of worker's compensation[,]" and further stated that Plaintiff "appeared to be 'falling apart.'" [*Id.* at ¶ 16]. Following another shoulder operation on September 3, 2019, Mr. Williams returned to work on the sweeping and mowing crew, from late September 2019 to early June 2020. [*Id.* at ¶ 18]. On May 11, 2020, Mr. Pumphrey allegedly asked Mr. Williams again "how much longer he planned on working for the City." [*Id.* at ¶ 23].

In June 2020, Mr. Williams returned to work on the concrete crew in order to trade places with another employee "who was cross training . . . with the sweeping and mowing crew." [*Id.* at ¶ 24]. On Thursday, July 16, 2020, Supervisor Koehler held a regularly scheduled crew meeting, where he informed the crew that Mr. Williams would be returning to work on the sweeping and mowing crew. [*Id.* at ¶ 25]. In response, Mr. Williams "objected to this move in front of the other workers." [*Id.*]. Mr. Williams believed he would "return to his regular job duties as a foreman on the concrete crew." [*Id.* at ¶ 26]. When Mr. Williams questioned Supervisor Koehler about his basis for moving Plaintiff back to the sweeping and mowing crew, Mr. Koehler responded "that this was not his decision, but they could talk to Superintendent

Pumphrey about it." [*Id.*].   Immediately thereafter, Mr. Williams and Supervisor Koehler met privately in Mr. Koehler's office, where he "began yelling at Mr. Williams", questioned whether Mr. Williams sincerely believed he was "going to be full time to replace" the individual who had replaced Mr. Williams on the concrete crew, and reiterated that Defendant Pumphrey was the relevant decisionmaker regarding Plaintiff's work assignment.   [*Id.* at ¶ 27].   In response, Plaintiff "told Mr. Koehler that he would not stay in a room where Mr. Koehler was yelling at him" and left the meeting.  [*Id.* at ¶ 28].

After the meeting, Mr. Williams left a voicemail for Defendant Pumphrey, who was absent that day, to request a meeting with him and Supervisor Koehler.  [*Id.* at ¶ 29].   Mr. Williams also called the supervisor of sweeping and mowing "to tell [the supervisor] that [Plaintiff] would see him on Monday morning."   [*Id.*].   Mr. Williams then went home for the day.  [*Id.* at ¶ 30].   That afternoon, Defendant Pumphrey notified Mr. Williams that he was being placed on administrative leave, but did not provide Plaintiff a reason for the administrative leave despite his requests for the same.   [*Id.*].   Mr. Williams ultimately "was accused of 'violence in the workplace' and 'conduct unbecoming a foreman,'" which were based on his "supposedly intimidating Mr. Koehler by leaving the meeting in Mr. Koehler's office where Mr. Koehler was yelling at him."  [*Id.* at ¶ 31].

On July 21, 2020, Mr. Williams attended an administrative hearing with HR.  [*Id.*  at ¶¶ 31, 39].  The same day, Defendant Pumphrey recommended that Plaintiff be terminated.  [*Id.* at ¶ 32].   In the document recommending the termination ("Termination Memo"), Defendant Pumphrey "referred to an incident that happened in 2000" and identified four other incidents "to purportedly justify termination."   [*Id.* at ¶¶ 32–37].   Mr. Williams alleges that those incidents were used as a subterfuge "to cover the real reason for Mr. Pumphrey recommending termination

– Mr. Williams was getting older, physically wearing out, and becoming a liability for the City." [*Id.* at ¶ 38].

On August 12, 2020, Mr. Williams attended a second administrative hearing with HR and the Director of Public Works, Don Wick ("Director Wick").  [*Id.* at ¶ 39].[1]  Mr. Williams alleges that at both hearings, "the City disregarded the testimony from two witnesses who said that they were 25 feet away from Mr. Koehler's office and heard Mr. Koehler yelling at Mr. Williams" and stated "they never heard Mr. Williams raise his voice in the meeting"; and instead "credited testimony from two witnesses, friendly to the City, who were not even in the building at the time of the yelling."  [*Id.* at ¶¶ 39–40].  Mr. Williams claims "the hearings were perfunctory and had nothing to do with whether Mr. Williams committed 'violence in the workplace.'"  [*Id.* at ¶ 42].

Mr. Williams was scheduled for another meeting on September 9, 2020, with the Director of Public Works.  [*Id.* at ¶ 43].  Prior to that meeting, however, a representative from HR, Jeff Monzingo ("Mr. Monzingo"), informed Plaintiff that the Director of Public Works planned on firing Mr. Williams at the meeting unless he "chose to retire" beforehand.  [*Id.*].  Mr. Williams claims he "had no choice but to retire" and, therefore, "was constructively discharged."  [*Id.*]. Mr. Williams's position as foreman on the concrete crew was filled by someone younger than 40 years old.  [*Id.* at ¶ 44].

Mr. Williams asserts five causes of action in the Complaint:

(1)     Age discrimination against the City in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* and the Colorado Anti-Discrimination Act ("CADA"), Colo. Rev. Stat. § 24-34-401(1)(a) ("Claim I");

---

[1] Plaintiff does not identify Director Wick by name in the Complaint.  However, Defendants' Motion and the Termination Memo identify the Director's name.  *See* [Doc. 13 at 3; Doc. 13-2 at 1].  Thus, for ease of reference, the court will refer to the Director of Public Works as "Director Wick."

(2)     Discrimination on the basis of a perceived disability against the City in violation

of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, and CADA

("Claim II");

(3)     "Age Discrimination Plus" against the City in violation of the ADEA ("Claim

III");

(4)     Aiding and Abetting Age Discrimination against Defendant Pumphrey in

violation of the CADA ("Claim IV"); and

(5)     Intentional interference with contract against Defendant Pumphrey ("Claim V").

[*Id.* at ¶¶ 45–61].

## II.     Procedural History

Plaintiff initiated this action by filing the Complaint on August 17, 2021.  [Doc. 1].  Upon

the consent of the Parties, [Doc. 7], this action was referred to the undersigned Magistrate Judge

for all purposes, *see* [Doc. 11].   On October 15, 2021, Defendants filed the instant Motion to

Dismiss, [Doc. 13], as well as their Answer to the Complaint, [Doc. 14].  On October 20, 2021,

this court held a Scheduling Conference and set a discovery deadline of April 20, 2022, and a

dispositive motion deadline of May 13, 2022.  [Doc. 16 at 9].  On November 5, 2021, Plaintiff

responded to the Motion to Dismiss, [Doc. 17], and Defendants replied on November 18, 2021,

[Doc. 18].  Thus, the Motion to Dismiss is ripe for determination.

## LEGAL STANDARDS

## I.     Federal Rule of Civil Procedure 12(b)(1)

Federal courts are ones of limited jurisdiction; "[t]hey possess only that power authorized

by Constitution and statute . . . which is not to be expanded by judicial decree."  *Kokkonen v.*

*Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S. Ct. 1673, 1675, 128 L. Ed. 2d 391

(1994) (citations omitted).  Federal Rule of Civil Procedure 12(b)(1) provides that a complaint

may be dismissed for "lack of subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).  "Dismissal under Rule 12(b)(1) is not a judgment on the merits of the plaintiff's claim.  Instead, it is a determination that the court lacks authority to adjudicate the matter."  *Creek Red Nation, LLC v. Jeffco Midget Football Assn., Inc.,* 175 F. Supp. 3d 1290, 1293 (D. Colo. 2016) (citing *Castaneda v. INS,* 23 F.3d 1576, 1580 (10th Cir. 1994)).  "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking."  *Caballero v. Fuerzas Armadas Revolucionarias de Colombia,* 945 F.3d 1270, 1273 (10th Cir. 2019) (quoting *Safe Streets All. v. Hickenlooper,* 859 F.3d 865, 878 (10th Cir. 2017)).

## II.     Federal Rule of Civil Procedure 12(b)(6)

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff."  *Casanova v. Ulibarri,* 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States,* 561 F.3d 1090, 1098 (10th Cir. 2009)).  A plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009); *see also Robbins v. Okla.,* 519 F.3d 1242, 1247 (10th Cir. 2008) (explaining that plausibility refers "to the scope of the allegations in a complaint," and that the allegations must be sufficient to nudge a plaintiff's claim(s) "across the line from conceivable to plausible.").  The court must ultimately "determine whether the complaint sufficiently alleges facts supporting all the elements necessary

to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

In deciding a motion under Rule 12(b)(6), the ultimate duty of the court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forsgren*, 478 F.3d at 1160. Thus, ordinarily, a court is confined to the four corners of a pleading in determining a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, taking well-pleaded facts as true. *See Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). Should the court receive and consider materials outside the complaint, it may convert a Rule 12(b)(6) motion to a motion for summary judgment if the parties have notice of the changed status and the nonmovant responded by supplying its own extrinsic evidence. *See Alexander v. Okla.*, 382 F.3d 1206, 1214 (10th Cir. 2004). However, under Tenth Circuit precedent, a "district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002) (citing *GFF Corp. v. Associated Wholesale Grocers, Inc.,* 130 F.3d 1381, 1384 (10th Cir. 1997)).

## ANALYSIS

Defendants seek to dismiss (1) Plaintiff's age discrimination claim against the City (Claim I); (2) Plaintiff's age discrimination plus claim against the City (Claim III); (3) Plaintiff's aiding and abetting age discrimination claim against Defendant Pumphrey (Claim IV); and Plaintiff's intentional interference with contract claim against Defendant Pumphrey (Claim V). *See* [Doc. 13]. The court will address Defendants' arguments with respect to each claim in turn.

I.      **Plaintiff's Age Discrimination Claims**

Defendants first seek to dismiss (1) Plaintiff's age discrimination claim against the City (Claim I) and (2) Plaintiff's aiding and abetting age discrimination claim against Defendant Pumphrey (Claim IV) for failure to state a claim.  *See* [Doc. 13 at 3–10].  The court will address each claim separately.

A.      **Age Discrimination against the City (Claim I)**

Mr. Williams asserts his age discrimination claim under the ADEA and CADA.  *See* [Doc. 1 at ¶ 46].  The ADEA prohibits employers from discriminating against any individual over forty "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1); *see also id.* § 631(a) ("The prohibitions in this chapter shall be limited to individuals who are at least 40 years of age."). Likewise, CADA prohibits employers from "refus[ing] to hire," "discharge[ing]," "promot[ing] or demot[ing]," or "discriminat[ing] in matters of compensation, terms, conditions, or privileges of employment against any person otherwise qualified because of . . . age[.]" Colo. Rev. Stat. § 24-34-402(1)(a).  Because CADA parallels federal anti-discrimination statutes like the ADEA, courts analyze claims under those two statutes under the same standards.  *See, e.g.*, *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1219 n.11 (10th Cir. 2010) ("Colorado and federal law apply the same standards to discrimination claims" (citing *Colo. Civil Rights Comm'n v. Big O Tires, Inc.*, 940 P.2d 397, 400 (Colo. 1997)); *Agassounon v. Jeppesen Sanderson, Inc.*, 688 F. App'x 507, 509 (10th Cir. 2017) (analyzing CADA and Title VII claims under the same standard); *Adkins v. United Food & Commercial Workers Int'l Union, Local 7*, 16 F. App'x 855, 859 (10th Cir. 2001) ("Ms. Adkins's claims under the ADEA, Title VII, and [CADA] are analyzed under the same three-part framework established for employment discrimination claims."); *see also Aluru v. Anesthesia Consultants*, 176 F. Supp. 3d 1116, 1123–24 (D. Colo. 2016).

For purposes of Rule 12(b)(6), "Plaintiff [need not] establish a prima facie case [of discrimination] in [his] complaint, [but] the elements of each alleged cause of action help to determine whether Plaintiff has set forth a plausible claim." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).  Thus, to state a plausible disparate treatment claim under the ADEA, Mr. Williams must allege sufficient facts for the factfinder to conclude that he was "(1) within the protected class of individuals 40 or older; (2) performing satisfactory work; (3) terminated from employment; and (4) replaced by a younger person, although not necessarily one less than 40 years of age." *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1056 (10th Cir. 2020) (quoting *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1146 (10th Cir. 2008)).  These "elements of a prima facie case under the *McDonnell Douglas* framework are neither rigid nor mechanistic, [and] their purpose is the establishment of an initial inference of unlawful discrimination warranting a presumption of liability in [the] plaintiff's favor." *Adamson*, 514 F.3d at 1146.  This principle "is particularly true in an age discrimination case." *Frappied*, 966 F.3d at 1056 (citing *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1139 (10th Cir. 2000)); *cf. Sanchez v. Denver Pub. Sch.,* 164 F.3d 527, 531 (10th Cir. 1998) (explaining that, to prove a prima facie case of age discrimination, a plaintiff must show: "1) she is a member of the class protected by the [ADEA]; 2) she suffered an adverse employment action; 3) she was qualified for the position at issue; and 4) she was treated less favorably than others not in the protected class").  Indeed, generally, "[t]he critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'" *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1227 (10th Cir. 2000) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  If a plaintiff establishes his prima facie case, the burden

then shifts to the employer "to articulate a legitimate nondiscriminatory reason for the [adverse employment] action." *Sanchez,* 164 F.3d at 531. If the employer meets its burden, then the burden shifts back to the plaintiff to show that the employer's proffered reasons are pretext for discrimination. *Id.*

  ***Plaintiff's Prima Facie Case.*** Defendants' Motion does not appear to challenge Plaintiff's ability to establish his prima facie claim. *See* [Doc. 13]. Plaintiff alleges he was over 40 years old; that he retired only because the City was planning to terminate his employment; and that he was replaced by an individual who was younger than 40 years old. *See, e.g.*, [Doc. 1 at ¶¶ 4, 43–45; Doc. 14 ¶¶ 4, 43–45]. In addition, Plaintiff alleges "[h]e was doing satisfactory work when he was discharged." [Doc. 1 at ¶ 45]. In the Reply, Defendants confirm they "are not relying on the burden shifting test" but then conclude that "[t]he burden has not shifted to Defendants to supply a non-discriminatory reason for Plaintiff's termination because Plaintiff's Complaint fails to establish a prima facie case of age discrimination." [Doc. 18 at 1]. Insofar as Defendants suggest that Plaintiff must come forward with enough admissible evidence to establish a prima facie case of discrimination to avoid dismissal at this juncture, this court respectfully declines to adopt such a standard. *See Khalik*, 671 F.3d at 1192.

  To the extent that Defendants challenge whether Mr. Williams has sufficiently alleged that his termination occurred under circumstances giving rise to an inference of unlawful discrimination, *see generally* [Doc. 13; Doc. 18], the court finds that Mr. Williams has done so. Specifically, Plaintiff's allegations demonstrate the following:

- Defendant Pumphrey was Mr. Williams's superintendent at the time of Plaintiff's termination. [Doc. 1 at ¶ 1].

- Mr. Williams was employed by the City for 32 years. [Doc. 1 at ¶¶ 4–5, 43].

- Mr. Williams was the most experienced employee "on the backhoe [and] in fabricating metals for the jobs." [*Id.* at ¶ 5]; *see also* [Doc. 14 at ¶ 5].

- In 2017, Mr. Williams and a coworker, both of whom were over 40 years old at the time, applied for an open supervisory position; and "they were the only applicants over 40 years old." [Doc. 1 at ¶ 8]. "The then-superintendent, Mark Bowman," advised them "not to submit their resumes, which, to them, seemed a reasonable directive" given their respective decades-long tenures with the City. [*Id.*]. However, "because they did not submit their resumes, they were rated as the eighth and ninth applicants out of a total of nine applicants" and were not considered for the job, which ultimately went to an applicant who was younger than Mr. Williams and his coworker. [*Id.* at ¶ 9].

- On February 6, 2019, Mr. Pumphrey and supervisor Keith Bohan "asked Mr. Williams how much longer he planned to work before retiring." [*Id.* at ¶ 10].

- On March 13, 2019, Mr. Pumphrey asked Mr. Williams "if he needed to get someone younger to do a job [P]laintiff was working on." [*Id.* at ¶ 10].

- On May 7, 2019, Mr. Pumphrey asked Mr. Williams "how old he was and . . . when he planned on retiring." [*Id.* at ¶ 11].

- On June 8, 2019, Defendant Pumphrey and Supervisor Koehler were caught "searching [Plaintiff's] private locker at work" in an effort to "find evidence of some wrongful conduct upon which they could force [Plaintiff's] departure." [*Id.* at ¶ 13]. When Plaintiff questioned Messrs. Pumphrey and Koehler about the search of Plaintiff's locker, including "why they didn't tell him first before searching his locker, as the City's policies require[,] [t]heir answers were evasive." [*Id.* at ¶ 14].

- In August 2019, Mr. Pumphrey asked Plaintiff "how he was holding up[,]" stated "that this work is hard on the body and referred to [P]laintiff's use of worker's compensation[,]" and further stated that Mr. Williams "appeared to be 'falling apart.'" [*Id.* at ¶ 16].

- In May 2020, Mr. Pumphrey asked Mr. Williams again "how much longer he planned on working for the City." [*Id.* at ¶ 23].

- In June 2020, during a regularly scheduled crew meeting, Mr. Williams publicly objected to a reassignment to work on the sweeping and mowing crew because "he had been cleared to return to his regular job duties as a foreman on the concrete crew" and "was the best person to operate the backhoe and to fabricate items necessary for the crew." [*Id.* at ¶ 26].

- When Plaintiff questioned Mr. Koehler about the basis for Plaintiff's move back to the sweeping and mowing crew, Mr. Koehler responded "that this was not his decision, but they could talk to Superintendent Pumphrey about it." [*Id.*].

- Thereafter, Mr. Koehler and Plaintiff met in Mr. Koehler's office, where he "began yelling at Mr. Williams". [*Id.* at ¶ 27].

- Mr. Williams alleges he "knew that he could not lose his temper" during the meeting because, in the past, "he had seen City supervisors" provoke employees to lose control of their temper "as an excuse to fire the employee for 'violence in the workplace.'" [*Id.*]. Therefore, Plaintiff "told Mr. Koehler that he would not stay in a room where Mr. Koehler was yelling at him" and left the meeting. [*Id.* at ¶ 28].

- After the meeting, Plaintiff left Mr. Pumphrey a message requesting a follow-up meeting with him and Supervisor Koehler. [*Id.* at ¶ 29]. Mr. Pumphrey returned

Plaintiff's call later that day and informed Plaintiff that he was being placed on administrative leave, "but he refused to give a reason for the leave even though [P]laintiff asked for a reason[,]" which Plaintiff claims "was against City policy which requires that the supervisors talk to the employee before putting the employee on administrative leave." [*Id.* at ¶ 30].

- Plaintiff ultimately was "accused of 'violence in the workplace' and 'conduct unbecoming a foreman,'" both of which were based on Plaintiff's conduct during the meeting with Supervisor Koehler. [*Id.* at ¶ 31].

- The incident was then elevated to HR, "with the goal of termination." [*Id.*]. Plaintiff claims this "was against the practices of the City because Mr. Williams should have received no more than a reprimand and a chance to discuss the issue with Mr. Pumphrey and Mr. Koehler." [*Id.*].

- When Plaintiff met with HR, "the City disregarded the testimony from two witnesses who said that they were 25 feet away from Mr. Koehler's office and heard Mr. Koehler yelling at Mr. Williams" and, instead, "credited testimony from two witnesses, friendly to the City, who were not even in the building at the time of the yelling." [*Id.* at ¶¶ 39–40].

- On July 21, 2020, Mr. Pumphrey "wrote a recommendation for [Plaintiff's] termination" wherein he "referred to an incident that happened in 2000" and "solicited after the fact four incidents . . . to justify termination." [*Id.* at ¶ 32]. The first such incident occurred in September 2014—six years before Plaintiff's termination—and Plaintiff had already received a written reprimand "for unbecoming public conduct" related to that incident. [*Id.* at ¶ 33]. The second incident occurred

in 2016, and Plaintiff's then-supervisor "said nothing of it at the time." [*Id.* at ¶ 34]. The third and fourth incidents occurred in November 2018 and spring 2019, respectively, and Plaintiff claims that neither situation "was [ ] an incident at all when" when each occurred. [*Id.* at ¶¶ 35–36].

- Plaintiff alleges that the four incidents referenced in the termination recommendation "were used as an excuse to cover the real reason for Mr. Pumphrey recommending termination – Mr. Williams was getting older, physically wearing out, and becoming a liability to the City." [*Id.* at ¶ 38].

- Mr. Williams's position as foreman on the concrete crew was filled by an individual younger than 40 years old. [*Id.* at ¶ 44].

In presuming the truthfulness of all factual allegations and in drawing all reasonable inferences in favor of Plaintiff at this stage, the court finds that Plaintiff sufficiently alleges the elements of his prima facie age discrimination claim. *See Ballas v. Chickasaw Nation Indus., Inc.*, No. CIV-13-1094-D, 2014 WL 4957262, at *3 (W.D. Okla. Oct. 2, 2014) (concluding, "[a]lthough Plaintiffs' allegations are somewhat conclusory, taken as true and in the light most favorable to Plaintiffs, the facts alleged are sufficient to state a plausible ADEA claim," because the plaintiffs allege they were over 40, were qualified for their positions, were terminated, and younger employees were not terminated); *cf. Sprague v. Kasa Indus. Controls, Inc.*, 250 F.R.D. 630, 633–34 (D. Kan. 2008) (dismissing the plaintiff's ADEA claim where "the only allegations made to support her claim under the ADEA are that she was fifty-six years old at the time of her termination, that defendant terminated her because of her age, that certain representatives of defendant were aware of her age, and that she suffered damages.").

Further, this court is not persuaded, as Defendants contend, that Mr. Williams wholly fails to allege that his age was the "but-for" cause of his termination. *See* [Doc. 13 at 5–10; Doc. 18 at 1–5]. In the Motion, Defendants insist that the Complaint "fails to plausibly establish that the City terminated [Plaintiff] because of his age", and rely upon *Gross v. FBL Fin. Services, Inc.*, 557 U.S. 167 (2009) in support of their position. [Doc. 13 at 5]. In *Gross*, the United States Supreme Court held that "[t]o establish a disparate-treatment claim under the plain language of the ADEA, . . . a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." 557 U.S at 176. Based on that holding, Defendants argue that the Complaint fails to establish "the causal connection to age required under *Gross*." [Doc. 13 at 6]. However, "but-for cause does not mean age was the only factor—it means that it was the factor that made a difference." *Bevins v. First Natl. Bank of Omaha*, No. 20-cv-00557-RM-NYW, 2020 WL 9257255, at *5 (D. Colo. July 27, 2020) (citations omitted), *report and recommendation adopted*, 2020 WL 9257256 (D. Colo. Aug. 12, 2020); *see also Jones v. Oklahoma City Public Schools*, 617 F.3d 1273, 1277 (10th Cir. 2010).

Indeed, following the Supreme Court's opinion in *Gross*, the Tenth Circuit in *Jones* held that, "to succeed on a claim of age discrimination, a plaintiff must prove by a preponderance of the evidence that her employer would not have taken the challenged action but for the plaintiff's age." *Id.* (citations omitted). Further, the *Jones* court disagreed with the defendant's argument that "*Gross* established that 'age must have been the only factor' in the employer's decision-making process." *Id.* The court explained that

> [t]he Tenth Circuit has long held that a plaintiff must prove but-for causation to hold an employer liable under the ADEA. Moreover, we have concluded that this causal standard does not require plaintiffs to show that age was the sole motivating factor in the employment decision. *Instead, an employer may be held liable under the ADEA if other factors contributed to its taking an adverse action, as long as age was the factor that made a difference. Gross does not hold*

> otherwise. Accordingly, *Gross* does not disturb longstanding Tenth Circuit precedent by placing a heightened evidentiary requirement on ADEA plaintiffs to prove that age was the sole cause of the adverse employment action.

*Id.* at 177–78 (emphasis added) (citations and quotations omitted).

Defendants argue that the only allegations related to Plaintiff's age are those regarding Mr. Pumphrey's "comments to Plaintiff about his age or retirement." [Doc. 13 at 6–7 (citing [Doc. 1 at ¶¶ 10, 11, 23)]. Defendants further contend that such comments do not establish Defendant Pumphrey's discriminatory animus regarding Plaintiff's age; and "Mr. Pumphrey's comments about when Plaintiff planned to retire, how much longer he planned to work for the City, and if he needed to get someone younger to do the job . . . are not indicative of any discriminatory animus" but rather indicative of "casual conversation and managerial planning." [*Id.* at 7, 9]. However, Defendants' arguments are misplaced. At this stage in the proceedings, the court need only "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forsgren*, 478 F.3d at 1160. The court finds that Plaintiff's allegation that "Mr. Pumphrey asked [P]laintiff how much longer he planned on working for the City" in May 2020—approximately two months before Mr. Pumphrey recommended Plaintiff's termination—combined with Mr. Pumphrey's similar comments one year earlier, *see* [Doc. 1 at ¶ 11 ("On May 7, 2019, Mr. Pumphrey asked plaintiff how old he was and again asked when he planned on retiring."), sufficiently nudge Plaintiff's age discrimination claim "across the line from conceivable to plausible." *Robbins*, 519 F.3d at 1247; *see also Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013) ("Comments in the workplace that reflect personal bias do not qualify as direct evidence of discrimination unless the plaintiff shows the speaker had decisionmaking authority and acted on his or her discriminatory beliefs. We also have explained that discriminatory

statements do not qualify as direct evidence if the context or timing of the statements is not closely linked to the adverse decision." (citations omitted)).

***Causation/Cat's Paw Theory of Liability.***   Defendants also argue that the Complaint fails to establish a causal link between any alleged age-based discriminatory animus and Plaintiff's termination, based on a "cat's paw" theory of liability, [Doc. 13 at 7–9], whereby "an employer who acts without discriminatory intent can be liable for a subordinate's discriminatory animus if the employer uncritically relies on the biased subordinate's reports and recommendations in deciding to take adverse employment action." [*Id.* at 7 (quoting *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015) (quotations omitted)]; *see also Ward v. Jewell*, 772 F.3d 1199, 1205 (10th Cir. 2014) (observing that such a theory may only establish causation when a plaintiff shows that the final decisionmaker adopted a supervisor's biased recommendation without an independent investigation).[2]   More specifically, Defendants contend that the Complaint does not allege that Director Wick "had any discriminatory animus or age-based basis for terminating Plaintiff." [Doc. 13 at 8].

Based on this cat's paw theory of liability, Defendants argue that Plaintiff's Complaint fails to state a claim because he does not sufficiently allege that Mr. Pumphrey had any age-based discriminatory animus toward Plaintiff, and therefore Plaintiff's termination by Mr. Wick could not be based on any such animus.   *See* [*id.* at 9].   Defendants point to the "incidents of insubordination" referenced in Mr. Pumphrey's Termination Memo to support their position that Plaintiff's termination was based on those incidents, and not age discrimination.   *See* [Doc. 13 at 9 (citing [Doc. 1 at ¶¶ 32–37])].   Defendants also argue that Mr. Williams "does not allege Mr.

---

[2] Mr. Williams's Response appears to concede that he is asserting a cat's paw theory of liability. *See* [Doc. 17 at 11 ("Plaintiff has submitted sufficient allegations to proceed under both this [cat's paw] theory and a standard theory of liability.")].

Pumphrey was dishonest in his memorandum" and "does not indicate that Mr. Pumphrey included any age-based concerns he had with Plaintiff in his memorandum." [*Id.*]. Thus, Defendants assert, "even if all facts alleged in the Complaint are true, Plaintiff cannot show that Mr. Pumphrey engaged in any discriminatory actions against Plaintiff." [*Id.* at 10]. The court is not persuaded.

Defendants appear to take the position that Plaintiff does not sufficiently allege any *direct* evidence of age-based discrimination. *See* [*id.* ("Mr. Pumphrey's memorandum was truthful and appropriate; Plaintiff simply disagrees with Mr. Pumphrey's bringing up his past history and the recommendation for termination. Such disagreement does not translate to a discriminatory animus that infected the City's upper management.")]. But Plaintiff need not allege direct discrimination. Instead, the *McDonnell Douglas* burden-shifting framework applies in situations "[w]hen evidence of discrimination is circumstantial, rather than direct," *Tabor*, 703 F.2d at 1216, and a plaintiff need only establish his prima facie claim at the motion to dismiss stage. *See Robinson v. Dean Foods Co.*, No. 08-cv-01186-REB-CBS, 2009 WL 2382764, at *3 (D. Colo. July 30, 2009). As discussed above, this court concludes that Plaintiff has sufficiently alleged facts to support a claim of age discrimination at this juncture. *See supra.* In addition to the allegations regarding Defendant Pumphrey's age-based comments, the Complaint alleges that Defendant Pumphrey "solicited the[ ] four incidents [identified in the Termination Memo], after the fact, in an effort to justify [Plaintiff's] termination." [Doc. 1 at ¶ 37]. Plaintiff also alleges that three of the incidents identified in the memo, which ranged from one year to four years before Plaintiff's termination, were nonissues when they occurred. *See* [*Id.* at ¶¶ 34–36]. Notably, the Termination Memo referenced another incident that occurred 20 years before Plaintiff's termination. *See* [*id.* at ¶ 32]; [Doc. 17 at 11 (arguing that "Mr. Pumphrey's

recommendation of termination was a pretext because it was based on five incidents (the four in the past, which raised no concerns at the time they occurred, and the most recent alleged 'violence' with Mr. Koehler) which would not support termination")]; *see also Kendrick*, 220 F.3d at 1227 ("The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'" (citation omitted)); *cf. Smith v. Chrysler Corp.,* 155 F.3d 799, 809 (6th Cir. 1998) ("[a]n employer's strategy of simply tossing out a number of reasons . . . in the hope that one of them will 'stick' could easily backfire. . . . [A] multitude of suspicious explanations may itself suggest that the employer's investigatory process was so questionable that any application of the 'honest belief' rule is inappropriate") (cited with approval in *Tyler v. RE/MAX Mountain States, Inc.,* 232 F.3d 808, 814 (10th Cir. 2000) (holding that when the plaintiff casts substantial doubt on many of the employer's multiple reasons, the jury could reasonably find the employer lacks credibility)).

Defendants further argue that Plaintiff fails to establish causation under a cat's paw theory on the basis that the City "broke the causal chain between any animus and the Plaintiff's termination by conducting an independent investigation." [*Id.* at 10]. In particular, Defendants contend that the City obtained witness statements, "reviewed files, and pulled video surveillance"; "asked Plaintiff for his version of events twice"; and "did not rely on the 'say-so' of Mr. Pumphrey in isolation." [*Id.*]. The court finds Defendants' argument unavailing for two reasons. First, and most notably, Plaintiff's Complaint does not allege the details of HR's investigation process as described by Defendants in the Motion, nor does Mr. Williams allege

what factors went into the City's termination decision.[3]   *See* [Doc. 1]; *see also Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994) ("The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true.").   Rather, Mr. Williams alleges that his dispute with Supervisor Koehler should never have escalated to the point of an HR investigation in the first place and, instead, that Plaintiff "should have received no more than a reprimand and a chance to discuss the issue with Mr. Pumphrey and Mr. Koehler."  [Doc. 1 at ¶¶ 31–32].  The Complaint then alleges that "the City disregarded the testimony from two witnesses" who provided testimony vindicating Mr. Williams and, instead, "credited testimony from two witnesses . . . who were not even in the building at the time of the yelling."  [*Id.* at ¶¶ 39–40].   Further, Mr. Williams claims "the hearings were perfunctory and had nothing to do with whether Mr. Williams committed 'violence in the workplace.'"  [*Id.* at ¶ 42].  Thus, Defendants' reliance on its own description of an investigation not alleged in the Complaint, without any supportive authority, carries no weight at this stage in the proceedings.

Second, the case Defendants rely upon in support of their causation arguments, *Thomas v. Berry Plastics Corp*., is inapplicable to the court's determination of whether Mr. Williams has sufficiently stated a claim of age discrimination.  As Defendants point out, the issue before the Tenth Circuit in *Thomas* was whether the district court erred in granting *summary judgment* in favor of the employer, not a motion to dismiss, which is presently before this court.  *See Thomas*, 803 F.3d at 512, 514; *see also* [Doc. 13 at 7].  Moreover, the Tenth Circuit has held that for a

---

[3] To the extent Director's Wick's Disciplinary Action Report, [Doc. 13-3], outlines the HR investigation process, such information is irrelevant to the court's evaluation of Plaintiff's age discrimination claim, pursuant to Rule 12(b)(6), based on the four corners of the Complaint; and Defendants do not proffer that document for the court's analysis of this claim.

plaintiff to succeed under a cat's paw theory of liability, he "must show that the allegedly biased investigator's discriminatory reports, recommendation, or other actions were the proximate cause of the adverse employment action[,]" and "an unbiased supervisor can break the causal chain by conducting an 'independent investigation' of the allegations against an employee." *Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1253 (10th Cir. 2006).

Here, Mr. Williams alleges, and Defendants appear to agree, that Plaintiff's termination resulted at least in part from Mr. Pumphrey's Termination Memo. *See* [Doc. 1 at ¶ 32; Doc. 18 at 5 ("The only action taken by Mr. Pumphrey which affected Plaintiff's termination was the authoring of the memorandum.")]; *cf. Sheets v. Salt Lake Cty.*, 45 F.3d 1383, 1389 (10th Cir. 1995) ("A defendant is the proximate cause of a plaintiff's injury if the injury [is] a natural consequence of defendant's actions."). Defendants insist that the Complaint does not allege that Director Wick "had any discriminatory animus or age-based basis for terminating Plaintiff." [Doc. 13 at 8]. Plaintiff does not, however, allege that Director Wick conducted his own investigation separate from HR before reaching the decision to terminate Plaintiff. *See* [Doc. 1]. Indeed, based on the allegations in the Complaint, it is unclear whether Plaintiff even had his final meeting that was scheduled with Director Wick on September 9, 2020, given Plaintiff's claim that "[p]rior to that meeting, Jeff Monzingo, senior business partner in HR, told Mr. Williams that [Mr. Wick] was going to fire him in that meeting unless Mr. Williams chose to retire" beforehand. [Doc. 1 at ¶ 43].

In any event, the court need not examine here whether or not the City broke the causal chain between Defendant Pumphrey's Termination Memo and Plaintiff's ultimate termination. This court is satisfied that Plaintiff has sufficiently pled causation in the Complaint to state a plausible claim for age discrimination against the City and that there is an insufficient basis to

determine, as a matter of law at this juncture, that the causal chain to Director Wick was broken.[4]

The court therefore **DENIES** the Motion to Dismiss as to Plaintiff's First Claim.[5]

## B.     Age Discrimination Plus against the City (Claim III)

Mr. Williams asserts his Third Claim against the City for "Age Discrimination Plus", arguing that "the City is liable for age discrimination plus perceived-disability discrimination." [Doc. 1 at ¶ 53]. Mr. Williams alleges that "[t]he ADEA prohibits such discrimination even if the perceived-disability discrimination is not itself protected." [*Id.*]. Defendants seek to dismiss Plaintiff's Third Claim on the basis that there is no legal basis for an age-plus claim under the ADEA. *See* [Doc. 13 at 10; Doc. 18 at 6–8]. The court agrees.

In his Response, Plaintiff cites to *Frappied v. Affinity Gaming Blackhawk, LLC*, 966 F.3d 1038 (10th Cir. 2020)—wherein the Tenth Circuit held "that sex-plus-age claims are cognizable under Title VII," 966 F.3d at 1048—to support his proposition that "[b]ecause an ADA claim is analyzed the same way that a Title VII claim is analyzed, it is easy to substitute the ADA for Title VII." [Doc. 17 at 13]. However, *Frappied* does not suggest that a plaintiff may merely "substitute the ADA for Title VII" and, thereby, create an "age-plus-perceived-disability" claim.

---

[4] Defendants also contend that "organizations are permitted to move around or even terminate employees as long as it is for a legitimate, non-discriminatory reason," and Plaintiff's Complaint "fails to establish that [Plaintiff's] termination was caused by age discrimination." [Doc. 18 at 4]. However, insofar as Defendants seek to challenge Mr. Williams's ability to state an age discrimination claim beyond his prima facie case, the court finds that "it is not appropriate to evaluate the issues of an employer's legitimate [non-discriminatory] reason for its actions, and an employee's evidence of pretext," at the motion to dismiss stage. *Robinson*, 2009 WL 2382764, at *3; *see also Prier v. Steed*, 2004 WL 624971, at *2 (D. Kan. Mar. 19, 2004) ("Rebutting a defendant's proffered rationale for an employment action is not an element of the plaintiff's prima facie case, and plaintiff is under no obligation to supply such evidence in response to defendant's motion [to dismiss].").

[5] In so ruling, this court expressly does not pass on the merits of Defendants' causation arguments, including the applicability of the cat's paw theory of liability.

Indeed, as the law currently stands, mixed-motive age discrimination claims are improper under the ADEA. *See Woods v. Boeing Co.*, 355 Fed. App'x 206, 211 (10th Cir. 2009) ("*Gross* makes clear that mixed motive age discrimination claims . . . are never proper in ADEA cases." (citing *Gross*, 557 U.S. at 167)); *see also Locke v. Grady Cty.*, 437 Fed. App'x 626, 629 (10th Cir. 2011) (explaining that the requirement that age must have been the but-for reason for the adverse employment action under *Gross* "does not disturb longstanding Tenth Circuit precedent by placing a heightened evidentiary requirement on ADEA plaintiffs to prove that age was the sole cause of the adverse employment action," nor does it "preclude [the] continued application of *McDonnell Douglas* to ADEA claims." (citation and quotations omitted)); *Griddine v. GP1 KS-SB, Inc.*, No. 2:17-cv-02138-JAR, 2019 WL 1002049, at *18 (D. Kan. Feb. 28, 2019) ("The Supreme Court has held that the ADEA does not authorize mixed-motives age discrimination claims . . ."); *Famighette v. Rose*, No. 2:17-cv-2553 (DRH)(ARL), 2018 WL 2048371, at *5 (E.D.N.Y. May 2, 2018) (relying upon the holding in *Gross*, and noting that "[c]ourts in the Second Circuit have not entertained mixed motive cases for age discrimination"); *Kelly v. Drexel U.*, 907 F. Supp. 864, 875 n.8 (E.D. Pa. 1995) ("I find no authority to recognize an 'age-plus-disability' discrimination claim under the ADEA. Therefore, plaintiff is not entitled to protection as a member of a subclass of older workers with disabilities."), *aff'd,* 94 F.3d 102 (3d Cir. 1996)).   Accordingly, the court finds that Plaintiff fails to state a claim for age discrimination plus as alleged under his Third Claim, and therefore **GRANTS** Defendants' Motion to Dismiss as to that claim.

### C.   Aiding and Abetting Age Discrimination against Defendant Pumphrey (Claim IV)

Mr. Williams asserts his Fourth Claim against Defendant Pumphrey for aiding and abetting age discrimination, alleging that Mr. Pumphrey assisted "the City in forcing Mr.

Williams to resign" in violation of Colo. Rev. Stat § 24-34-201(1)(e)(I).  [Doc. 1 at ¶ 56].  That section of the CADA provides that "[i]t is a discriminatory or unfair employment practice . . . [f]or any person, whether or not an employer, an employment agency, a labor organization, or the employees or members thereof: (I) [t]o aid,  abet, incite, compel, or coerce the doing of any act defined in this section to be a discriminatory or unfair employment practice . . ."  Colo. Rev. Stat. § 24-34-201(1)(e)(I).

Defendants seek to dismiss Plaintiff's Fourth Claim on the same grounds asserted in support of their request to dismiss Plaintiff age discrimination claim (Claim I), arguing that the Complaint does not establish any discriminatory animus on the part of Mr. Pumphrey or that such animus caused Plaintiff's termination.  *See* [Doc. 13 at 3–10 (analyzing Claim I and Claim IV together)].   As concluded above, viewing the allegations in the light most favorable to Plaintiff, I find that Plaintiff has sufficiently pled both Mr. Pumphrey's age-related bias leading up to Plaintiff's termination and Mr. Pumphrey's direct involvement in Plaintiff's termination— which Defendants acknowledge was based at least in part on the substance of Defendant Pumphrey's Termination Memo.  *See* [Doc. 13 at 14]; *see also Mondragon v. Adams Cty. Sch. Dist. No. 14*, No. 1:16-cv-01745-LTB-KMT, 2017 WL 733317, at *13 (D. Colo. Feb. 24, 2017) (finding the plaintiff sufficiently pled an aiding and abetting claim under the CADA based on allegations regarding the defendants' "initiation of a surreptitious investigation against [the plaintiff] and false allegations of an affair or other promiscuousness" by the defendant). Accordingly, I **DENY** Defendant's Motion to Dismiss as to Plaintiff's Fourth Claim.

## II.    Intentional Interference with Contract against Defendant Pumphrey (Claim V)

Mr. Williams asserts his Fifth Claim against Defendant Pumphrey for intentional interference with contract, alleging that "Mr. Pumphrey by words or conduct intentionally caused the City to terminate [Plaintiff's] employment contract."  [Doc. 1 at ¶ 58].  Mr. Williams further

alleges that Defendant Pumphrey's actions arose "out of personal bias and not as part of his official duties" and, therefore, "he was acting outside of his official duties when he caused [Plaintiff's] termination." [*Id.* at ¶ 59].

Defendants seek to dismiss Plaintiff's Fifth Claim pursuant Rule 12(b)(1) for lack of subject matter jurisdiction, and pursuant to Rule 12(b)(6) for failure to state a claim. [Doc. 13 at 11–20]. The court will address each argument in turn.

### A.      Rule 12(b)(1) – Subject Matter Jurisdiction

Challenges to subject matter jurisdiction may take two different forms—a facial attack or a factual attack—which implicate different analytical frameworks. First, in a facial challenge, the focus is on the sufficiency of the allegations in the complaint. *See United States v. Rodriquez Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001). In resolving a facial challenge, "the district court must accept the allegations in the complaint as true." *Id.* Second, "a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter depends." *Id.* In addressing a factual challenge to subject matter jurisdiction, "the court does not presume the truthfulness of the complaint's factual allegations, but has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Id.* (citation and quotations omitted). In such an instance, "a court's reference to evidence outside the pleadings does not convert the motion into a Rule 56 motion." *Stuart v. Colorado Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001). The party invoking federal jurisdiction has the burden of establishing said jurisdiction. *Merida Delgado v. Gonzales*, 428 F.3d 916, 919 (10th Cir. 2005).

Here, Defendants' Motion appears to lodge both a facial and factual attack as to the court's subject matter jurisdiction. *See* [Doc. 13 at 11 ("Defendants challenged Plaintiff's Complaint factually and have attached the following exhibits in support thereof . . ."); *id.* at 12

("Plaintiff's Complaint fails to establish that Mr. Pumphrey acted outside the scope of his employment.")]. Thus, the court will address each such challenge below. Before turning to the Parties' arguments, however, the court first considers the record before it—specifically, the exhibits Defendants attach to the Motion and Plaintiff attaches to his Response. *See* [Doc. 13-1; Doc. 13-2; Doc. 13-3; Doc. 17-1; Doc. 17-2; Doc. 17-3; Doc. 17-4].

### 1. Defendants' Documents

Defendants proffer three exhibits in support of their factual challenge to this court's subject matter jurisdiction over Plaintiff's intentional interference with contract claim: (1) the Affidavit of Jeff Monzingo, [Doc. 13-1]; (2) Defendant Pumphrey's Termination Memo, [Doc. 13-2]; and (3) Don Wick's Disciplinary Action Report, [Doc. 13-3]. *See* [Doc. 13 at 11–12]. Defendants reference each of those exhibits to support their arguments that "Mr. Pumphrey's actions were within the performance of his official duties." [*Id.* at 12–14]. Defendants also cite to the Termination Memo, [Doc. 13-2], in support of their facial challenge as to whether Plaintiff has sufficiently alleged willful and wanton conduct on the part of Mr. Pumphrey. *See* [*id.* at 14–15].[6] The court finds Defendants' exhibits relevant to their factual challenge to the jurisdictional basis for Plaintiff's intentional interference with contract claim—specifically, whether Defendant Pumphrey was acting within the scope of his employment when he recommended Plaintiff's termination.

First, Defendants cite to the Affidavit of Mr. Monzingo, [Doc. 13-1], to support their assertion that Defendant Pumphrey drafted the Termination Memo "as part of the Human Resources Investigation process." [Doc. 13 at 13]; *see also* [Doc. 13-1 at ¶ 6]. Second,

---

[6] As explained below under the analysis of Plaintiff's intentional interference with contract claim, under the Colorado Governmental Immunity Act, a public employee may be held liable for conduct that is willful and wanton. *See* Colo. Rev. Stat. § 24-10-118(2)(a).

Defendants reference the Termination Memo, [Doc. 13-2], for the propositions that the document "lists managerial concerns with Plaintiff's actions over his term of employment with the City" and "it is clear the writing of and concerns listed in the memorandum were part of Mr. Pumphrey's assigned duties and he was acting only to further the goals of his employer." [Doc. 13 at 13–14]. Third, Defendants cite to Director Wick's Disciplinary Action Report, [Doc. 13-3], in support of their contentions "that the only information Director Wick considered from Mr. Pumphrey in his disciplinary action to terminate Plaintiff (in addition to the Human Resources investigation, videos, and Mr. Wick's own interview and observations of Plaintiff) was the information contained in Mr. Pumphrey's memorandum." [Doc. 13 at 14]. Accordingly, the court finds it appropriate to consider these documents in addressing Defendants' factual challenge as to whether Plaintiff sufficiently alleges that Defendant Pumphrey acted within the scope of his employment when he recommended Plaintiff's termination. *See Rodriquez Aguirre*, 264 F.3d at 1203.

Moreover, the court may also consider the Termination Memo when evaluating Defendants' facial challenge to subject matter jurisdiction. Indeed, Plaintiff references that document in the Complaint, *see* [Doc. 1 at ¶¶ 32–36]; Defendant Pumphrey's termination recommendation is central to Plaintiff's intentional interference claim, *see* [*id.* at ¶¶ 58–60]; and Plaintiff does not challenge the document's authenticity, *see* [Doc. 17]. *See Jacobsen*, 287 F.3d at 941 ("[A] district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity."); *Masterpiece Cakeshop Inc. v. Elenis*, 445 F. Supp. 3d 1226, 1239 (D. Colo. 2019) (reviewing document incorporated into the complaint by reference in Fed. R. Civ. P. 12(b)(1) motion to dismiss); *MER, LLC v. Comerica Bank*, 2013 WL 539747, at *1 (D. Colo. Feb. 13, 2013) (same).

### 2.      Plaintiff's Documents

Plaintiff includes with his Response the declarations of three former employees of the City: (1) the Declaration of Brian Stone, [Doc. 17-1]; (2) the Declaration of Laura Benningfield, [Doc. 17-2]; and (3) the Declaration of Tom Swartwood, [Doc. 17-3].  Plaintiff also attaches a fourth document: an excerpt of a "Streets Division Workplace Climate Assessment" ("Workplace Climate Assessment"), a report that was commissioned by the City and performed by outside consultants.  [Doc. 17-4].

Mr. Williams proffers the Declarations of Mr. Stone, Ms. Benningfield, and Mr. Swartwood, [Doc. 17-1; Doc. 17-2; Doc. 17-3], to support his argument that "the City would move people to the sweeping and mowing crew in hopes of making them quit, that Mr. Pumphrey abused his authority, and that the City would use a sham proceeding to force employees to quit."  [Doc. 17 at 9].  In addition, Plaintiff references the Workplace Climate Assessment, [Doc. 17-4], for the consultants' conclusion stated therein, that "[a]geism was a consistent theme across interviews and focus groups, contributing to in-out group dynamics." [Id. at 2]; see also [Doc. 17 at 8].  In their Reply, Defendants contend that Plaintiff's exhibits "are admissible and relevant only to whether the [c]ourt has subject matter jurisdiction over the tort claim against Mr. Pumphrey as Plaintiff cannot improperly attempt to amend his Complaint by attaching documents to his Response."  [Doc. 18 at 8 n.1].

The court finds the Declarations of Mr. Stone, Ms. Benningfield, and Mr. Smartwood to be irrelevant to the court's examination of Defendants' factual attack as to the court's subject matter jurisdiction.  Indeed, Plaintiff proffers those documents for the express purpose of presenting additional "facts" in support of his claims.  See [Doc. 17 at 5–9 ("[T]he three declarants establish that the City would move people to the sweeping and mowing crew in hopes of making them quit, that Mr. Pumphrey abused his authority, and that the City would use a

sham proceeding to force employees to quit."). And although Plaintiff references those Declarations when arguing that Defendant Pumphrey "was not acting in the scope of his official duties", [*id.* at 14 (capitalizations omitted)], he cites them in support of his assertion that Defendant Pumphrey "abused his power with three other employees (Stone, Benningfield, and Swartwood) which shows that he is willing to trample on employee's rights for whatever motivation." [*Id.* at 15]. Thus, Plaintiff's attachment of the Declarations constitutes an improper attempt to amend the allegations in the Complaint via his Response, and the court declines to consider those documents. *See In re Qwest Commun. Intern., Inc.*, 396 F. Supp. 2d 1178, 1203 (D. Colo. 2004) ("The plaintiffs may not effectively amend their Complaint by alleging new facts in their response to a motion to dismiss.").

Likewise, the court also finds that Plaintiff references the Workplace Climate Assessment, [Doc. 17-4], constitutes an improper attempt to amend the factual allegations in the Complaint. *See* [Doc. 17 at 3 n.2 (arguing that "it is reasonable to infer that [Plaintiff's and his coworker's] applications were sabotaged" in 2017, and that claim "is relevant to the extent the Streets Division has been corrupt over the years, a point raised in the declarations and in an outside assessment of the Division"); *id.* at 8 (asserting that the findings in the Workplace Climate Assessment indicate "that the consultants found consistent complaints of age discrimination" and "age bias was a part of the streets division culture")]. Thus, the court declines to consider that document as well. The court now turns to Defendants' arguments.

### 3.   Application

As an initial matter, this court may exercise supplemental jurisdiction over Plaintiff's Fifth Claim pursuant to 28 U.S.C. § 1367(a). However, Defendants assert that the Colorado Governmental Immunity Act ("CGIA") bars Plaintiff's intentional interference with contract claim against Defendant Pumphrey, a public employee. *See* [Doc. 13 at 12–15]. The CGIA,

codified at Colo. Rev. Stat. §§ 24-10-101 to -120, bars actions in tort against public employees and entities, subject to certain provisions waiving immunity and "essentially extends the State of Colorado's sovereign immunity to employees of a municipality." *Carani v. Meisner*, No. 08-cv-02626-MSK-CBS, 2009 WL 2762719, at *1 (D. Colo. Aug. 26, 2009), *aff'd,* 521 Fed. App'x 640 (10th Cir. 2013); *see also Martinez v. Est. of Bleck*, 379 P.3d 315, 322 (Colo. 2016) ("[W]hether a public employee's conduct is willful and wanton conduct under section 24-10-118(2)(a) implicates a public employee's sovereign immunity."); *Medina v. State*, 35 P.3d 443, 453 (Colo. 2001).   The act covers "all the circumstances under which the state, any of its political subdivisions, or the public employees of such public entities may be liable in actions which lie in tort."   Colo. Rev. Stat. § 24-10-102.   The term "public employee" is defined as "an officer, employee, servant, or authorized volunteer of the public entity."  *Id.* at § 103(4).

A claim of sovereign immunity implicates the court's subject-matter jurisdiction.  *E.F. W. v. St. Stephen's Indian High School,* 264 F.3d 1297, 1302–03 (10th Cir. 2001); *Fletcher v. United States,* 116 F.3d 1315, 1324 (10th Cir. 1997); *Springer v. City & Cty. of Denver,* 13 P.3d 794, 798 (Colo. 2000) ("Governmental immunity raises a jurisdictional issue.").   Although sovereign immunity is recognized as an affirmative defense, the party seeking to sue a defendant that enjoys sovereign immunity bears the burden of showing that such immunity has been waived. *See, e.g.*, *James v. U.S.,* 970 F.3d 750, 752 (10th Cir. 1992); *Smith v. Bd. of Educ.,* 83 P.3d 1157, 1167 (Colo. App. 2003).   Thus, because the Parties do not dispute that Defendant Pumphrey is a public employee under the CGIA, *see* [Doc. 13 at 12; Doc. 17], it is Plaintiff's burden here to plead facts sufficient to allege that Defendant Pumphrey's conduct was "willful

and wanton," *see* Colo. Rev. Stat. § 24-10-118(1), (2)(a), so as to take him outside the protection of the CGIA.[7]

Here, Defendants argue that the CGIA applies to Mr. Pumphrey's actions because (1) he was acting within the scope of his employment, and (2) his actions were not willful or wanton. [Doc. 13 at 12–15].   As mentioned, Defendants assert factual and facial challenges as to the court's subject matter jurisdiction over Plaintiff's intentional interference claim.   *See* [Doc. 13 at 11–12].   More specifically, Defendants appear to submit both challenges *only* with respect to their argument that "Mr. Pumphrey's actions were within the performance of his official duties." *See* [*id.* at 12–14].   However, as to Defendants' argument that "Mr. Pumphrey's actions were not willful or wanton", [*id.* at 14], Defendants assert only a facial challenge as to the sufficiency of the allegations in the Complaint; and make only a passing reference to—and without any corresponding reliance upon—the Termination Memo, *see* [*id.* at 15 ("In looking at **Exhibit B**, the Court can see that Plaintiff merely concludes that "[t]he actions of defendant Pumphrey were willful and wanton" when Plaintiff's conclusion is noticeably devoid of any factual support. *See* Complaint, ¶ 61." (emphasis in original))].   Thus, the court will limit its examination of Defendants' exhibits, if necessary, to their scope-of-employment argument.

---

[7] The Parties do not dispute that Plaintiff's intentional interference claim sounds in tort, and the court finds that it does.   *See   Mueller v. Swift*, No. 15-cv-1974-WJM-KLM, 2017 WL 2362137, at *12 (D. Colo. May 31, 2017) ("Under Colorado law, . . . intentional interference with contract is an intentional tort, just as the name suggests." (citing *Carman v. Heber*, 601 P.2d 646, 648 (Colo. App. 1979))); *Casey v. Colorado Higher Educ. Ins. Benefits Alliance Trust*, 310 P.3d 196, 201 (Colo. App. 2012) ("[t]he essential difference between a tort obligation and a contract obligation is the source of the parties' duties. Contract obligations arise from promises made between parties. Tort obligations generally arise from duties imposed by law, and tortious conduct is a breach of a duty imposed by law, not by contract.") (citation omitted)); *Robinson v. Colorado State Lottery Div.*, 179 P.3d 998, 1003 (Colo. 2008) ("[w]hen the injury arises either out of conduct that is tortious in nature or out of the breach of a duty recognized in tort law, and when the relief seeks to compensate the plaintiff for that injury, the claim likely lies in tort or could lie in tort for purposes of the CGIA.").

*Acting Within the Scope of Employment (Factual and Facial Challenges).*   "An act occurs within the scope of employment if it is necessarily incidental to the employment, with the central inquiry [being] whether the employee is engaged in an activity that bears some relationship to the employer's business." *First Nat'l Bank of Durango v. Lyons*, 349 P.3d 1161, 1169 (Colo. App. 2015) (citation and quotations omitted)).   "An act also is within the scope of employment if it occurs pursuant to work the employee does that is assigned to him by his employer . . . or is customary in the employer's business." *Podboy v. Fraternal Or. of Police, Denver Sheriff Lodge 27*, 94 P.3d 1226, 1230 (Colo. App. 2004) (citation omitted).

In the Complaint, Plaintiff alleges that "because [Defendant Pumphrey] was acting out of personal bias, he was acting outside of his official duties when he caused [Plaintiff's] termination." [Doc. 1 at ¶ 59].  Defendants argue that Mr. Pumphrey "acted within the scope of his employment as a supervisor assisting in disciplining an insubordinate employee when he wrote the memorandum, and as such he has immunity for the interference claim." [Doc. 13 at 14].  Defendants also rely upon their exhibits in support of their arguments. *See* [*id.* at 13–14].

As discussed above, there is no dispute that Mr. Pumphrey was a public employee as contemplated by the CGIA.  Colo. Rev. Stat. § 24–10–103(4) ("Public employee" is defined as "an officer, employee, servant, or authorized volunteer of the public entity").  In Mr. Monzingo's Affidavit, he states that "[w]hen a supervisor disciplines an employee exceeding a reprimand, work group supervisors and/or managers are required to write a memorandum to both the employee and the appointing authority (department director) outlining their disciplinary recommendation and the reasons underlying such recommendation"; and "[i]n this instance, . . . Mr. Pumphrey wrote a memorandum recommending Brian Williams' termination . . . as part of the disciplinary process." [Doc. 13-1 at ¶¶ 5–6].  Regardless of whether Mr. Pumphrey was

acting out of personal bias, Plaintiff cites no authority to support his proposition that his bias translates into a conclusion that Mr. Pumphrey was acting outside of the scope of his employment for the purposes of the CGIA.  [Doc. 17 at 14–15].  Despite Defendants' failure to address it in their Reply, this court is not persuaded that *Tesone v. Empire Marketing Strategies*, 2018 WL 828031, *3 (D. Colo. 2018), necessarily resolves the issue as it does not arise within the context of Eleventh Amendment immunity and the CGIA.  *See* [Doc. 17 at 14 (Plaintiff's relying upon *Tesone* for the argument that "no employer would agree that violating the law with such a recommendation would be within an employee's scope of duties."); *cf. King v. McKillop*, 112 F. Supp. 2d 1214, 1221 (D. Colo. 2000) (observing that "the failure of a public employee to perform his duties adequately does not render the employee's conduct outside the course and scope of his employment").

Whether Plaintiff or Defendants have sufficiently established that Defendant Pumphrey was acting within or outside the scope of his employment when he recommended Plaintiff's termination is of no consequence at this juncture, however, because even if Defendant Pumphrey were acting within the scope of his employment when he recommended Plaintiff's termination, the question remains as to whether his actions were "willful and wanton."  *See* Colo. Rev. Stat. § 24-10-118(2)(a); *Castaldo v. Stone*, 192 F. Supp. 2d 1124, 1139 (D. Colo. 2001).  And, as explained further below, I find that Mr. Williams sufficiently alleges willful and wanton conduct on the part of Defendant Pumphrey.

***Willful and Wanton (Facial Challenge).***  A public employee may only be held liable for conduct that is willful and wanton:

> [a] public employee shall be immune from liability in any claim for injury . . . which lies in tort or could lie in tort regardless of whether that may be the type of action or the form of relief chosen by a claimant and which arises out of an act or omission of such employee occurring during the performance of his duties and

> within the scope of his employment *unless the act or omission causing injury was willful and wanton.*

Colo. Rev. Stat. § 24-10-118(2)(a) (emphasis added).  "Whether a plaintiff has pleaded sufficient facts to state a claim based upon willful and wanton conduct is a matter determined by the court."  *Castaldo*, 192 F. Supp. 2d at 1139 (citing *Barham v. Scalia,* 928 P.2d 1381, 1385 (Colo. App. 1996)).

The CGIA also "imposes a heightened pleading requirement for plaintiffs alleging that a public employee acted willfully and wantonly." *Schmitz v. Colo. State Patrol*, 841 Fed. App'x 45, 49 (10th Cir. 2020) (citing Colo. Rev. Stat. § 24-10-110(5)(a) ("In any action in which allegations are made that an act or omission of a public employee was willful and wanton, the specific factual basis of such allegations shall be stated in the complaint.")).  Failure to plead the factual basis under this heightened requirement results in dismissal for failure to state a claim upon which relief can be granted.  *Id.* at § 110(5)(b).  *But see Schmitz*, 841 Fed. App'x at 50 ("[W]e're unpersuaded that any of these procedural rules relating to Colorado's Immunity Act apply in federal court because "the *Erie* doctrine instructs that federal courts must apply state substantive law and federal procedural law. . . . Though it appears that our precedents have yet to address this issue, other circuits have concluded that a state's heightened pleading requirements don't control in federal court." (collecting cases)); *Scott v. Cary*, 829 Fed. App'x 334, 336–37 (10th Cir. 2020) ("Defendants cite *Martinez v. Estate of Bleck*, 379 P.3d 315, 322 (Colo. 2016), for the proposition that Colorado requires courts to decide the issue of sovereign immunity on motion before trial. But state procedural law ordinarily does not govern proceedings in federal court; and in any event there are adequate federal procedures for disposing of immunity issues before trial without reliance on Rule 12(b)(1).").

The court need not determine whether the CGIA's heightened pleading standard applies here, because I find that Plaintiff sufficiently pleads that Defendant Pumphrey acted willfully and wantonly regardless of whether such allegations are examined under the Federal Rules of Civil Procedure or the CGIA.  Although the term "willful and wanton" is not defined in the CGIA, "the majority of courts have applied to definition set forth in Colorado's exemplary damages statute, Colo. Rev. Stat. § 13-21-102[,]" which requires that the public employee "act not only unlawfully, but with the intent to injure, or in conscious disregard of the probability that his acts would result in injury to the plaintiff." *Pittman v. City of Aurora*, No. 19-cv-02209-PAB-NRN, 2020 WL 508946, at *7 (D. Colo. Jan. 31, 2020) (quotation and internal quotation marks omitted).

In making their facial challenge as to this court's subject matter jurisdiction, Defendants argue that the Complaint "is noticeably devoid of any factual support" for Plaintiff's allegations of Defendant Pumphrey's willful and wanton conduct.  [Doc. 13 at 15].  The court respectfully disagrees.  As explained throughout this Order, Mr. Williams alleges that Defendant Pumphrey made age-based comments leading up to his termination.  He also alleges that his dispute with Supervisor Koehler should never have escalated to the point of an HR investigation in the first place and, instead, that Plaintiff "should have received no more than a reprimand and a chance to discuss the issue with Mr. Pumphrey and Mr. Koehler."  [Doc. 1 at ¶¶ 31–32].  In addition, Defendant Pumphrey drafted the Termination Memo, which recommended that Plaintiff be terminated based on various purported issues that transpired several years before Plaintiff's termination.  *See* [*id*. at ¶¶ 32–36].  Further, Plaintiff alleges that Defendant Pumphrey "solicited the[ ] four incidents [regarding purported violence], after the fact, in an effort to justify [Plaintiff's] termination."  [*Id.* at ¶ 37].  Under these circumstances, the court finds that, at this

stage in the proceedings, Plaintiff has sufficiently alleged willful and wanton conduct on the part

of Defendant Pumphrey to survive Defendants' facial challenge to the court's subject matter

jurisdiction over Plaintiff's intentional interference with contract claim.[8]

### B.      Rule 12(b)(6) – Failure to State a Claim

Defendants also seek to dismiss Plaintiff's intentional interference claim on the grounds

that the Complaint fails to plead facts upon which relief can be granted.  *See* [Doc. 13 at 16–20].

To establish a claim for intentional interference with contract, a plaintiff must allege "(1) a valid

contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3)

defendant's intentional acts designed to induce a breach o[r] disruption of the contractual

relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting

---

[8] In the Response, Plaintiff claims that Defendant Pumphrey would have a right to a hearing pursuant to *Trinity Broad. of Denver, Inc. v. City of Westminster*, 848 P.2d 916 (Colo. 1993) ("*Trinity* hearing"), to determine "whether this court has jurisdiction over this claim." [Doc. 17 at 14 n. 6].  Defendants counter that they "do not believe the *Trinity* hearing procedure applies in federal court under the [*Erie*] doctrine" and the Tenth Circuit's opinion in *Schmitz*.  [Doc. 18 at 8 n.2].  Defendants nevertheless offer to provide "further briefing or [attend] a hearing on the issue of sovereign immunity" should the court so require.  [Doc. 18 at 8 n.2].  The court finds *Schmitz* instructive.  In that case, the Tenth Circuit explained that Colorado "has established particular procedures for assessing claims that implicate a public employee's sovereign immunity."  841 Fed. App'x at 49.   The first requirement is that "Colorado imposes a heightened pleading requirement for plaintiffs alleging that a public employee acted willfully and wantonly."  *Id.* (citing to Colo. Rev. Stat. § 24-10-110(5)(a)).  "Second, even if the complaint contains sufficient allegations to support a claim against a public employee for willful and wanton conduct, the trial court, not a jury, must determine whether the employee is entitled to sovereign immunity."  *Id.* (citation omitted).  Colorado trial courts may conduct *Trinity* hearings in making such early immunity determinations, which are "effectively [ ] evidentiary hearing[s] dedicated solely to considering an employee's possible immunity from suit."  *Id.* (citations omitted).  Significantly, the court explained that it was "unpersuaded that any of these procedural rules relating to Colorado's Immunity Act apply in federal court because 'the *Erie* doctrine instructs that federal courts must apply state substantive law and federal procedural law.'" *Id.* (citations omitted); *see also Scott*, 829 F. App'x at 336–37 (10th Cir. 2020).  Accordingly, I will assume for the purposes of the instant Motion that Colorado's procedural laws do not bind this court.  And, in any event, as explained herein, *see supra*, this court finds that Plaintiff has sufficiently pled Defendant Pumphrey acted willfully and wantonly regardless of whether such allegations are reviewed under the Federal Rules of Civil Procedure or the CGIA.  Thus, the court does not find that a hearing is warranted to resolve the jurisdictional challenges in the Motion to Dismiss.

damage." *Otter Products, LLC v. Treefrog Developments, Inc.*, No. 11-cv-02180-WJM-KMT, 2012 WL 4478951, at *5 (D. Colo. Sept. 28, 2012) (quoting *Slater Numismatics, LLC v. Driving Force, LLC*, 310 P.3d 185, 193 (Colo. App. 2012)).

The court finds that Plaintiff has sufficiently pled each element in the Complaint—Plaintiff alleges (1) he had an employment contract with the City; (2) Defendant Pumphrey knew about the contract; (3) Mr. Pumphrey, through his intentional "words or conduct" that were based on his "personal bias and not as part of his official duties[,]" (4) caused the termination of Plaintiff's employment contract with the City; and (5) these actions caused Plaintiff damage. [Doc. 1 at ¶¶ 58–60].

Defendants also cite to *Spaziani v. Jeppesen Sanderson, Inc.*, No. 14-cv-03261-REB-KMT, 2015 WL 5307971, at *2 (D. Colo. Sept. 11, 2015), to support their argument that Plaintiff must allege that Defendant Pumphrey was acting with the "sole intent to harm" Plaintiff or present "evidence that Mr. Pumphrey was acting outside of his employment" in order to state a claim for intentional interference. *See* [Doc. 13 at 17–19]. However, as discussed above, Plaintiff's Complaint does make such allegations. *See, e.g.*, [Doc. 1 at ¶¶ 37–38 ("Mr. Pumphrey solicited these four incidents, after the fact, in an effort to justify [Plaintiff's] termination. . . . "These incidents were used as an excuse to cover the real reason for Mr. Pumphrey recommending termination – Mr. Williams was getting older, physically wearing out, and becoming a liability for the City."); *Id.* at ¶ 59 ("Mr. Pumphrey caused the termination of plaintiff's contract out of personal bias and not as part of his official duties.")].

Further, this court has already concluded that the allegations in the Complaint, taken as true, sufficiently state an age discrimination claim based on Defendant Pumphrey's comments and recommendation for Plaintiff's termination. Thus, the court is not persuaded by Defendants'

arguments that Mr. Pumphrey's comments were "innocuous statements about topics that Plaintiff and Mr. Pumphrey have in common, discussed during casual conversation, and relevant to managerial staffing and planning." [Doc. 13 at 18]. Indeed, such contentions constitute fact determinations that the court need not determine at the motion to dismiss stage.

Moreover, although the *Spaziani* court dismissed the plaintiff's intentional interference claim where the plaintiff alleged that her supervisor terminated her in part because of her sexual orientation, 2015 WL 5307971, at *2, that opinion does not reflect *comments* by the supervisor about the plaintiff's sexual orientation; whereas here, Mr. Williams alleges that Mr. Pumphrey made comments related to Plaintiff's age and ability to do his job as it related to his age. *See* [Doc. 1 at ¶¶ 10, 16, 23]. Whether or not such comments were, indeed, related to Plaintiff's termination are of no consequence to this court's determination that Plaintiff has sufficiently stated a claim for relief to proceed with his intentional interference claim against Defendant Pumphrey. *See Tesone v. Empire Mktg. Strategies*, No. 17-cv-02101-MEH, 2018 WL 828031, at *3 (D. Colo. Feb. 12, 2018) (finding that the plaintiff's allegations established that her supervisor terminated the plaintiff "out of personal bias, and not as part of her official duties"); *see also W.O. Brisben Co. v. Krystkowiak*, 66 P.3d 133, 137 (Colo. App. 2002) ("[A] corporate officer may be liable if he 'was motivated [by] personal animus towards one or both of the contracting parties.'" (quoting *Powell Prods., Inc. v. Marks*, 948 F. Supp. 1469, 1478 (D. Colo. 1996))), *aff'd* 90 P.3d 859 (Colo. 2004); *Zappa v. Seiver*, 706 P.2d 440, 442 (Colo. App. 1985) ("[I]f the officer or director is motivated solely by a desire to induce the corporation to breach its contract with the plaintiff or to interfere in the contractual relations between the corporation and the plaintiff, the interference is improper."); *Snoey v. Advanced Forming Tech., Inc.*, 844 F. Supp. 1394, 1401 (D. Colo. 1994) (stating that to prove an intentional interference claim against a

corporate officer, the plaintiff must demonstrate that the officer acted "for his own personal interests and not the interests of the corporation").

Finally, Defendants argue that the Complaint "fails to plausibly allege that Mr. Pumphrey's termination recommendation constituted improper interference with Plaintiff's employment contract" because the Termination Memo "refers to accurate incidents of Plaintiff's repeated insubordination" and "contains no statements regarding Plaintiff's age, physical abilities, or any other protected traits." [Doc. 13 at 19–20]. However, as explained above with respect to Defendants' jurisdictional challenges to this claim, that Defendant Pumphrey may have been required to draft the Termination Memo as part of the disciplinary process is irrelevant to Plaintiff's allegations that the specific discipline recommendation at issue—Plaintiff's termination—was based on conduct which Plaintiff claims did not warrant such a severe disciplinary response and was contrary to the policies of the City. *See, e.g.*, [Doc. 1 at ¶¶ 31–39, 58–61]. The same conclusion applies here, given that Defendants' arguments rely upon the "accurate incidents of Plaintiff's repeated insubordination", [Doc. 13 at 19], which Plaintiff alleges "were used as an excuse to cover the real reason for Mr. Pumphrey recommending termination – Mr. Williams was getting older, physically wearing out, and becoming a liability for the City." [Doc. 1 at ¶ 38]; *see also* [*id.* at ¶¶ 31–42]. In sum, the court finds that Mr. Williams has sufficiently stated a claim for intentional interference with contract under Claim V and, therefore, **DENIES** the Motion to Dismiss as to this claim.

## CONCLUSION

For the reasons stated herein, **IT IS ORDERED** that:

(1)     Defendants' Motion to Dismiss [Doc. 13] is **GRANTED IN PART AND DENIED IN PART**; and

(2)     Plaintiff's Age Discrimination Plus claim against the City (Claim III) is

**DISMISSED with prejudice**.


DATED:  April 13, 2022                          BY THE COURT:

                                                Nina Y. Wang
                                                United States Magistrate Judge